[L. A. No. 671. In Bank. — May 1, 1901.]

## SAN JOSÉ RANCH COMPANY and A. S. KIMBALL, Respondents, v. SAN JOSÉ LAND AND WATER COMPANY and SILVANUS WHITE, Appellants.

FORECLOSURE OF MORTGAGE — NON-NEGOTIABLE NOTE — ASSIGNMENT — DEFENSES AGAINST MORTGAGEE — NOTICE. — Where promissory notes secured by a mortgage sought to be foreclosed were non-negotiable, and passed by sale and assignment after maturity to the assignors of the plaintiffs, the plaintiffs took them subject to all equities and defenses in favor of the mortgagor against the original mortgagee; and it is immaterial that the plaintiffs and their assignors had no notice or knowledge of such equities or defenses.

ID. — MISTAKE IN MORTGAGE — INADVERTENCE OF SCRIVENER — FINDINGS — REFORMATION AGAINST ASSIGNEES. — Where the proofs adduced and the findings made in such foreclosure suit, under the answer and cross-complaint of the defendant mortgagor, establish a mistake in the mortgage, owing to the mistake and inadvertence of the scrivener in including property other than that purchased from the mortgagee by the mortgagor, which was alone agreed by them to be mortgaged, a finding that the plaintiffs and their assignors had no notice or knowledge of the mistake is immaterial; and on the facts found the court should have reformed the mortgage prior to foreclosure, to express the intention of the original parties thereto.

ID. — FAILURE OF CONSIDERATION — FRAUD IN SALE OF WATER RIGHT — PURCHASE UPON INDEPENDENT JUDGMENT — DEFENSE NOT SUSTAINED. — Where the answer of the mortgagor also pleaded a defense of fraud in the purchase of a water right by the mortgagor from the

mortgagee, and a corresponding failure of consideration for the notes and mortgage sued upon, but the evidence and findings established that the corporation mortgagor in entering into the agreement of purchase acted upon its own investigation and judgment by its officers and agents, the defense is not sustained.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial.   W. H. Clark, Judge.

The facts are stated in the opinion of the court.

R. Dunnigan, Dunnigan & Dunnigan, and Anderson & Anderson, for Appellants.

J. S. Chapman, for Respondents.

VAN DYKE, J.—The action was brought to foreclose a mortgage executed by the defendant company to one Peter H. Taylor, to secure the payment of two promissory notes of even date, for ten thousand dollars each.   The notes were made by the defendant company to said Taylor, in part payment of the purchase price of certain lands and water rights in the San Dimas Cañon, Los Angeles County.   The notes were non-negotiable, and passed by sale and assignment, after maturity, into the ownership of the plaintiffs.

Both by answer and cross-complaint the defendant corporation sets up and alleges,—1. Mistake in the contract of mortgage, and asks for a reformation thereof; 2. A failure of consideration, through fraud and misrepresentation on the part of Taylor, as to the value of his water right.   The appeal is taken from the judgment in favor of the plaintiffs and from an order denying defendants a new trial.

1. The questions presented on the appeal may be grouped under the two heads contained in the defendants' answer and cross-complaint.   In reference to the alleged mistake in the execution of the mortgage, the finding of the court is as follows:—

"That it was the intent, purpose, and understanding of the said defendant the San José Land and Water Company, and the said Peter H. Taylor, that said mortgage should create and constitute a lien only upon the land and water right conveyed by said Peter H. Taylor to said defendant the San José Land and Water Company, by the deed described in the seventh

paragraph of these findings, but, through mistake and inadvertence, and through the mistake of the scrivener who drafted said mortgage, in copying literally the description contained in said deed into said mortgage, said mortgage was so framed as to constitute a lien upon the flumes, aqueducts, and water rights owned by said defendant the San José Land and Water Company, other and different and in addition to the water rights, flumes, and ditches conveyed by said Taylor to said defendant by said described deed"; and further,—

"That said notes are non-negotiable notes, and at the time of said assignments by said Taylor to said Wicks, and by the said Wicks to the plaintiffs, the said A. S. Kimball, and the San José Ranch Company, said notes were past due, but said several assignments, and each of them, was made in good faith and for a valuable consideration, and neither the said Wicks nor the said Kimball nor the San José Ranch Company had at the time of the assignment by said Taylor to said Wicks, or at the time of the assignments by the said Wicks to Kimball and to the San José Ranch Company, notice or knowledge of any mistake contained in said mortgage, or that it was the intent or purpose of the parties to said mortgage to create a lien upon any water right or other property other than described in said instrument of mortgage."

It seems that the court, as a conclusion, found that the defendant was not entitled to relief on the ground of mistake in the execution of the mortgage, from the fact that the plaintiffs and their assignors had no notice or knowledge of the mistake. This fact is quite immaterial, as the notes in question were non-negotiable; besides, they were transferred by assignment after maturity, and the plaintiffs, as assignees, took subject to all the equities and defenses which could have been urged against the original payee. (Civ. Code, sec. 1459; Code Civ. Proc., sec. 368; *St. Louis Nat. Bank* v. *Gay*, 101 Cal. 286; 2 Pomeroy's Equity Jurisprudence, sec. 704; 1 Jones on Mortgages, secs. 841 et seq.; Wiltsie on Mortgages, sec. 354.)

On the facts found, the court below should have revised and reformed the mortgage, before decreeing its foreclosure, so as to express the intention of the parties when it was executed. (Civ. Code, secs. 3399, 3400, 3401, 3402.)

2. On the defense of failure of consideration, through the fraud and misrepresentation of Taylor, the vendor of the property, the court finds as follows: "That at and prior to the time

of the execution of said agreement, the said Peter H. Taylor represented to the defendant the San José Land and Water Company that said water right so claimed by him was a right to seventy inches of water, measured under a four-inch pressure, and acquired by prescription and adverse user; but such representations so made by the said Peter H. Taylor were not made fraudulently, or with intent to deceive the said defendant the San José Land and Water Company, or for the purpose of inducing the said defendant to enter into said contract of purchase, and said defendant was not deceived by said representations, and was not induced by reason thereof to enter into said agreement of purchase; but said defendant, in entering into said agreement, acted upon its own investigation and judgment and the investigation and judgment of its officers and agents, and not upon such representations, or any representations, made by the said Peter H. Taylor; and said defendant was, at the time of entering into said agreement, as fully informed and advised as to the character and extent of the water right so claimed and owned by the said Peter H. Taylor as was the said Peter H. Taylor himself."

The evidence fully supports the finding of the court to the effect that the defendant corporation, in entering into the agreement of purchase, acted upon its own investigation and judgment by its officers and agents.

T. W. Brooks, called on behalf of the defendant, was one of the organizers of the defendant corporation, and was president thereof at the date of the purchase and execution of the mortgage. He testified that he was acquainted with the San Dimas Cañon, and had thoroughly explored it, and detailed an account of his operations in that section of the country, giving the names of the different parties who claimed water rights in the same. He was, in fact, one of the main promoters of the scheme to develop and control the waters of that cañon and conduct the same to lands lying below its mouth. He said: "I thought that watershed, properly handled, was one of the valuable properties of Los Angeles County; that it was worth a million of dollars, with an expenditure of a hundred thousand to place a reservoir in it, which was my plan from the first." Again: "Seeing this, and knowing it to be a fact, and, furthermore, knowing that the summer water is a matter of no consideration,—it is so small that no intelligent man would fight another for it,—I saw that this property could be made a valu-

able property by building several reservoirs in the cañon, as was the plan, and I went to work to avail myself of this great watershed. It is the winter water that is worth money, and not the summer water, that so much talk is about. The stream dries up there, possibly, five years in twelve, and it has been so dry that people were troubled, within a distance of four miles, to get water to drink. These are notorious facts, that all the settlers know. So far as appropriations were concerned, and who was using the water, I found that there was none except Mr. Bixby, Mr. Young, and those people on the mesa, Mr. Chappel. Their amount of water was so small that it was not a consideration, but expected to be respected, and the amount more than respected, in all my plans and operations."

Mr. M. G. Rogers, another member. of the defendant corporation, and agent of the company to purchase the land from Taylor, and a witness for the defendant, stated that Taylor, at the time, claimed seventy inches of water, and that he had posted notice accordingly, and used the water for five or six years, and that they relied upon Taylor's statement. On cross-examination, however, he said that that conversation with Taylor was at the time he made the contract. He lived only about half a mile from Taylor, and had been acquainted with the waters of the cañon since 1874, and had known Taylor for about twelve years. He had looked at the ditch before he bought it, and was acquainted with the San Dimas Creek. The road from Rogers's house to the mountain went over Taylor's place, and he had been traveling over it occasionally for several years. He was asked this question: —

"Q. Did you, at that time, know about how much water ran in the stream as far down as Mr. Taylor's ditch, in the irrigating season, as a general rule? — A. Well, some years there was considerable, and some years there was n't very much.

"Q. Did n't the stream dry up, many years, above Mr. Taylor's place, in the summer-time? — A. The latter part of the season I think it almost dried up. I have seen the cañon dried clean up; that is, occasionally.

"Q. But, every year, along at the time they begin irrigation, have n't the waters of that stream subsided to such an extent that there is not more than from fifteen to twenty and twenty-five and thirty inches flowing down the— —A. That

might be, sir.  I have never seen it, sir, since I have been in the country.

"Q.  My question was, whether you meant that you never saw so much as twenty or thirty inches flowing down as far as the head of Taylor's ditch in the irrigating season? — A.  Well, that would depend on when you would call the irrigating season.  I have seen water running over his ditch when he would be irrigating.  He would have all the water in his ditch when he would be irrigating, and still quite a number of inches of water beyond his ditch flowing down the creek. Other seasons he would have it all taken, without none passing his ditch; and then, again, he would have none coming to his ditch; the creek would be dry; and I have seen and known the creek to be that way during the seasons that I have known it."

Again, he said: "Our company, or some of its members, were at that time claiming rights to the water in the creek, and there were other parties claiming a right to the use of it, to my knowledge, or to some portion of it.  I live a little ways above Mr. Taylor, in the cañon; about a half a mile."  And asked by the court, "In other words, you knew that the water rights in the cañon were in an unsettled condition?"  He answered, "Yes, sir; yes, sir; we did."

Mr. C. M. Wells, another of the original parties who organized the defendant corporation, testified that he went up the cañon with Brooks, and was introduced to Taylor.  Negotiations had been in progress before that time for the purchase of the Taylor property.  They had a general conversation in relation to his property and his water rights, and the character of them.  Taylor told him that he had appropriated seventy inches of water, and Wells asked him, during what portion of the year he would get water, and Taylor said it would vary. Some years he would not get any water after June; other years it would run up to August.  The negotiations for the purchase began before they had incorporated the defendant company, and continued after that.  The witness said further: "Our company was then claiming water rights in the cañon. We had the Chappel place at that time, and there was a water right in connection with it.  We were claiming the waters of the San Dimas Cañon that time, and the whole of it, and we recognized that Taylor had a right there.  We purchased Taylor's claim to extinguish his water right, — to acquire his

water right. The stream flows through the Taylor place in its natural course, when there is water enough in it to run down that far. Our company was obtaining water for the purpose of taking it out beyond the cañon upon other lands for use. The Taylor lands lay right directly along the route which we proposed to carry our pipe or ditch line. That would be the only possible route for it."

In view of the testimony, therefore, it is quite clear that the organizers and officers of the defendant corporation were quite as well acquainted with the San Dimas Cañon and the water flowing therein as the defendant Taylor himself, if not better. The finding of the court to that effect is therefore fully supported.

The facts having all been found on which to enter a proper judgment, a new trial is altogether unnecessary. The order will therefore be:—

Judgment reversed and cause remanded, with directions to the court below to revise the mortgage so that it will embrace only the property sold by Taylor, the mortgagee, to the defendant corporation, the mortgagor, and as thus reformed to enter judgment and decree of foreclosure thereon.

Garoutte, J., McFarland, J., Harrison, J., and Henshaw, J., concurred.

Rehearing denied.